**SMITH INDUSTRIES MEDICAL SYS-TEMS, INC., as successor of Inter-tech Resources, Inc., Plaintiff,**

v.

**VITAL SIGNS, INC., Defendant.**

No. CIV. A. 94 C 5758.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 31, 1997.

Allen H. Gerstein, Owen J. Murray, Richard Allen Schnurr, Donald J. Brott, Gregory Charles Mayer, Danielle M. Johnston, Marshall, O'Toole, Gerstein, Murray & Borun, Chicago, IL, for Intertech Resources, Inc.

Philip T. Petti, James J. Hamill, Mark A. Hamill, Fitch, Even, Tabin & Flannery, Chicago, IL, Richard L. Mayer, Michael D. Loughnane, Dana Renee Kaplan, John R Hutchins, Mark A Hannemann, Kenyon & Kenyon, New York, NY, R. Gale Rhodes, Evans, Osborne, Kreizmant & Bonney, Little Silver, NJ, Charles L. Thomason, Thomason & Moser, Red Bank, NJ, for Vital Signs, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEINENWEBER, District Judge.

This case involves manual resuscitators, which are devices designed to supply a patient with large quantities of air or oxygen. Such resuscitators are normally comprised of three components: a mask used to form a seal about the patient's mouth and nose; a directional control valve arrangement to direct the air or gas to the patient on inhalation and to direct the exhalants away during exhalation; and a squeezable bag to supply pressure. The distinguishing feature of most resuscitators is the directional control valve assembly. Most involve the use of flexible diaphragms that alternately open and close apertures by moving either toward or away from them depending on whether the pressure is from the squeeze bag (inhalation) or from the patient (exhalation).

The resuscitators in question utilize so called "duck-billed" diaphragms which get their name from their shape. The diaphragm is made of a circular piece of flexible material that has a raised portion resembling a duck bill with a slot in the middle of it. Pressure from behind opens the slot or bill allowing gas to go through to the patient and pressure from the front (from the patient) closes it by forcing the two bill portions together.

The plaintiff owns the patent rights to a disposable, manual resuscitator, U.S. Patent No. 4,744,941 (" '941 Patent" or the "Cook Patent"). It contends in this suit that the claims of the Cook Patent are infringed by particular disposable resuscitator products manufactured and sold by the defendant, namely the Code Blue and the Vital Blue lines of resuscitation devices[1]. The Cook

---

1. Specifically the devices include Model No. 7100, a mouth-to-mask resuscitator, Model Nos.

Patent describes the preferred embodiment as consisting of "a squeeze bag having a gas inlet and a gas outlet" with a specifically configured valve assembly joined to the bag over the gas outlet. The valve assembly is contained in a housing that includes the squeeze bag inlet opening, a patient port through which the gas flows to the patient, and an exhalation port by which exhalants from the patient on respiration are expelled to the outside through a tube.

The claims of the '941 Patent are as follows: Claim 1 is for a resuscitator having a double opening squeeze bag with which to supply the pressure for delivery of gas to the patient and a domed valve assembly featuring a duck-billed diaphragm which regulates the flow of gas to the patient and exhalants to the outside.[2] Claim 2 is a dependent to Claim 1 and adds a rigid cylindrical member extending out of the exit port. Claim 3 is likewise a dependent claim and merely describes in greater detail the shape of the duck-billed diaphragm. Claim 4 is for a resuscitator similar to Claim 1 only not calling specifically for a gas bag. It describes a means for supplying gas "having a hollow interior and a first and second openings at opposite ends." The court has previously ruled that this does not encompass a single entry squeeze bag. Claim 5 is dependent on Claim 4 with the rigid member described in Claim 2 and Claim 6 is dependent on Claim 4 with the duck-billed diaphragm described in Claim 3. Disposability is specifically not claimed.

The plaintiff claims that the invention of the Cook Patent consists of the specific structural arrangement of its valve assembly which it asserts is very simple, very clear and very inexpensive. Specifically, the directional control valve assembly consists of a domed housing, an unobstructed exit (exhalation) port, a tubular patient port that extended into the domed housing creating an annular (ringlike) passage connected to the exit port, and a duck-billed diaphragm, consisting of a duck-billed portion and ring portion that moves up and down in the domed housing depending on whether there is inspiration or expiration which alternately opens and closes the patient port and the exit port.

### Code Blue

The defendant's Code Blue devices differ from the preferred embodiment of the Cook Patent in one material aspect: the squeeze bag on the Code Blue devices are single opening, i.e., an outlet opening into the valve assembly through which pressurized gas is forced. The gas inlet is not connected to the bag but is located at the end of a tubular chamber that provides a means of extension and attachment to the gas supply. Squeezing the bag forces the contents (usually gas) of the bag through the patient port, and thereby creates a vacuum in the bag which sucks gas into it upon release of the bag. The process can then be repeated over again. Plaintiff contends that this configuration is covered by Claim 4(a) of the Cook Patent:

4. A resuscitator comprising:

(a) means for supplying gas having a hollow interior and first and second openings at opposite ends thereof.

Prior to trial defendant filed a motion for summary judgment contending that its Code Blue configuration did not infringe Claim

---

7200, 7300, and 7400, which are collectively the Code Blue Model and are differentiated by size, i.e., adult, pediatric, and baby. The squeeze bag on these devices has only one opening and is separate from the gas source. Defendant also manufactured a modified version of Model Nos. 7200, 7300 and 7400, the modification consisting of a slightly differing shape of a portion of the duck-billed valve. Model Nos. 7600, 7800 and 7900, collectively called Vital Blue, are likewise differentiated by size, and have a squeeze bag with openings at both ends, one connected to the gas source and the other to the valve assembly.

2. The duck-billed diaphragm, according to the patent claims, consists of four parts: (1) an out-

er, peripheral portion that is secured to the valve housing; (2) a convoluted, shuttle portion; (3) a flexible annular portion that seats with the patient port; and (4) the inner duck-billed portion.

"Convoluted shuttle" means that there is some extra material folded into the area between the valve housing and the patient port that allows the annular seating portion and the duck-billed portion to rise and fall without stretching the diaphragm.

Dependent Claims 3 and 6 specify the convoluted portion to be arcuate, i.e., arch shaped. The Laerdal valve and the Vital Blue valves are triangular shaped. It is plaintiff's position, not denied by defendant, that they are equivalents.

4(a). The court interpreted the patent pursuant to the authority of *Markman v. Westview Instruments,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), and concluded that the Code Blue devices did not literally infringe Claim 4(a) because "means for supplying gas" under the common accepted meaning connotes a mechanism that supplies the pressure rather than simply the supply of gas itself. The court, however, felt that there was a question of fact whether the Code Blue devices infringed the Cook Patent under the doctrine of equivalents. In other respects, including the duck-billed diaphragm, the Code Blue device operates in the same manner as the embodiment of the Cook Patent and is covered by the patent claims. The Code Blue devices were marketed by defendant from approximately 1988 to the present.

▆ The doctrine of equivalents requires the trier of fact to determine the "substantiality of the differences between the claimed and accused products according to an objective standard." *Hilton Davis Chemical Co. v. Warner–Jenkinson Co., Inc.,* 62 F.3d 1512, 1518 (Fed.Cir.1995). The normal way of assessing equivalence is the familiar "function, way and result" announced in *Graver Tank v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), particularly where the devices are characterized by relatively simple mechanical technology. *Hilton Davis,* 62 F.3d at 1518. However the trier of facts is entitled to weigh any other evidence that is relevant to the substantiality of the differences, or the lack thereof. The vantage point is one of ordinary skill in the relevant art. *Id.* at 1519. It is an issue of fact to be decided by the trier of fact. *Id.* at 1522.

▆ The court finds that the Code Blue devices do not infringe the Cook Patent under the doctrine of equivalents. In assessing the "substantiality of the differences," the court is to look at the "function, way, and result." The function is to resuscitate, *i.e.,* to restore or assist respiration of an individual. The way of doing so is the delivery of air or oxygen forcefully to the patients mouth through the use of a squeeze bag. The result is the receipt by the patient of the forced air or oxygen which is intended to force the onset of or assist the respiration on the part of the patient. However, the evidence showed and the court finds that the location of the gas source separate to that of the squeeze bag makes a material difference in the operation of the device. Richard McNary, an employee of plaintiff and a Registered Respiratory Therapist, and one skilled in the art[3], testified that a squeeze bag of the Code Blue configuration fills more slowly than a double entry bag because there is a more circuitous path for the gas to go but that it would in fact deliver a higher concentrate of gas to the patient. Terry Wall, CEO of defendant, testified that the single entry squeeze bag was less costly than the double entry bag described in the Cook Patent. Steven McPherson, defendant's expert, testified that the gas entry into a double entry bag assembly can be larger than the entry into a single bag resuscitator because the latter would be too bulky and the inlet and outlet are at the same end, thus allowing a greater concentration of gas to the patient. In addition, he testified that bag refill time is slower on single entry and the valve assembly is more complicated because the bag valve is at a right angle to the gas tube. Thus, the result and means are different. The only testimony to the contrary was that of Vital Sign's former marketing director that Code Blue and Vital Blue "functionally ... work the same way." She, however, was not one with ordinary skill in the art. What she obviously meant was that the gas ran through a squeeze bag and then was forced by the squeeze bag through the valve assembly to the patient. She did not testify that they performed at the same quality level.

### Vital Blue

Defendant's Vital Blue products began to be marketed in 1994 and continue to the present. There is not much dispute that the

**3.** Both sides agree that one skilled in the art includes a Registered Respiratory Therapist ("RRT"). Plaintiff's expert witness testified that one skilled in the art was an RRT of five (5) years experience; defendant's expert said that one skilled in the art merely needed to be an RRT. McNary was one skilled in the art under either definition.

Vital Blue lines infringe the Cook Patent if the Cook Patent is valid. The Vital Blue Line has the squeeze bag identically placed as in the preferred embodiment of the Cook Patent and as described in Claim 1. Defendant's defense to this claim is that the Cook Patent is invalid because it was anticipated and it was obvious.

■ Since the '941 Patent was allowed by The Patent and Trademark Office, it is presumed to be valid pursuant to 35 U.S.C. § 282 and the defendant has the burden of proving invalidity by clear and convincing evidence. *Jamesbury Corp. v. Litton Industrial Products, Inc.,* 756 F.2d 1556, 1559 (Fed.Cir.1985). Where a defendant relies on prior art that was considered by the Examiner, he has the added burden of overcoming the deference that is due to a qualified government agency. *Polaroid Corp. v. Eastman Kodak Co.,* 789 F.2d 1556, 1560 (Fed.Cir. 1986).

The patent statute requires that a patentable invention be novel. 35 U.S.C. § 101. The statute further provides that a person is not entitled to a patent if the invention was anticipated, *i.e.,* where a prior art device includes or a prior art reference discloses each element of the claim. 35 U.S.C. § 102(a). A patent claim is anticipated and barred when a device, which meets each and every claim, was in public use or on sale more than one year prior to the patent filing date. Even if an invention is not identically disclosed or described as set forth in § 102, if the differences between the invention and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art, the invention is not patentable. 35 U.S.C. § 103.

■ In determining obviousness, a court is required to answer certain factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) the secondary or objective evidence of nonobviousness. *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Secondary considerations include commercial success of the invention, whether it met long felt needs, failure by others to solve the problem solved by the invention and copying by others. *Id.* The patentee has the burden of showing that the commercial success was directly related to the patented invention and not some other consideration. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1392 (Fed.Cir.1988). Similarly, there must be a nexus between the patented invention itself and the long felt need.

■ In performing the task of determining obviousness, the court must imagine itself as one of ordinary skill in the art, remove the benefit of hindsight and pretend that it has never seen the invention. After familiarizing itself with the prior art, the court should ask if the invention would have been obvious, looking at the invention as a whole. *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1566 (Fed.Cir.1987). Ultimately, the test of obviousness is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination. *Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.,* 807 F.2d 955, 959 (Fed.Cir.1986).

This requires the court to determine the scope and content of the prior art, the differences between the prior art and the claims at issue and the level of ordinary skill in the pertinent art. Prior art includes the devices which were known or used in this country prior to the '941 filing date of May 4, 1983.

### The Prior Art

According to defendant, each of the elements of each claim of the Cook Patent can be found in the prior art. The plaintiff admits that each element can probably be found in the prior art but maintains that the specific combination taught by the Cook Patent was not anticipated nor was the combination obvious to one skilled in the art. The prior art references cited and relied upon by defendant are Ruben's AMBU Bag, Laerdal's Resusci Folding Bags I, II, and III (RFB I, II, and III), The Laerdal Diverter, Thumper Resuscitator, and Dr. Elam's disposable resuscitator which was marketed by Vital Signs as its Stat Blue product, prior to Code Blue.

a. The AMBU Bag was apparently the first manual resuscitator. It had a spring loaded disk that moved back and forth in a shaft of the valve assembly alternately opening and closing the valve to the oxygen source. The squeeze bag was double entry. The valve assembly consisted of a disk on the end of a spring. Pressure from the squeeze bag pushed the disk from the exit port of the bag past the patient port to occlude the exhalation port. Release of the bag and the spring allowed the disk to rebound back to seal the gas bag. This caused the exhalants to go out through the exhalation port, which were unobstructed.

b. Next came the Laerdal RFB I[4], a double entry squeeze bag, which was the first respirator to have a duck-bill valve diaphragm in the valve assembly. The top of the valve assembly had a series of 8 holes in a circle around the patient port tube. This patient port tube extends a little bit into the area between the bottom half and the top half of the valve assembly. The two parts of the valve assembly screw together, and separate to permit sterilization. Lying on the bottom half of the valve assembly is a rubber diaphragm, the center of which is the duck bill. The outer circular part holding up the duck bill sits on the bottom half of the valve. When gas pressure opens the duck-bill valve, it raises the body of the diaphragm so that it seats, or folds around, the base of the patient port making a seal. Upon exhalation the duck-bill valve closes and lies back on the base of the valve assembly sealing the gas inlet port thus forcing the exhalant to exit through the holes. Def.'s Ex. 3 is a Laerdal RFB I. It does not have the flapper valve and does operate with unobstructed exit ports.

c. The Laerdal '122 patent appears to include the RFB 1 bag with one important addition. It shows and describes in the claims a so-called "flapper valve" added to the duck-billed diaphragm valve assembly. This is a rubber ring that sits on the exit ports so as to prevent the patient from breathing outside air that might be contaminated should an unforeseen reduction in pressure occur at the bag side.

d. Laerdal '833 patent is for a collapsible bag. It does not describe the valve assembly. However the illustrations show a valve assembly and do not show a flapper valve over the exit ports, so that the exit ports appear unobstructed.

e. The RFB II was introduced in 1969. (Def.'s Ex. 43) The RFB III was introduced shortly thereafter. (Def.'s Ex. 411) Apparently, the difference between RFB II and RFB III is the former valve assembly extends in a straight line parallel to the axis of the squeeze bag. The latter includes a right angle extension to the valve assembly to direct the gas 90° of the parallel axis of the squeeze bag to the patient port.

f. According to the Laerdal catalog in 1982, Laerdal sold expiration diverters for both RFB II and RFB III. These were used to attach PEEP valves and to collect exhaled gases from the patient. A PEEP (Positive End Expiratory Pressure) valve is a device that can regulate the rate of supply of gas and the rate of exhalations, *i.e.*, to slow down forced breathing. The diverter creates a chamber surrounding the valve assembly that directs exhalants through a rigid exit port.

g. The Thumper Resuscitator. This is a forced air resuscitation system using a Venturi pump rather than a squeeze bag. Prior to 1982, Michigan instruments, a Laerdal distributor, sold the Thumper, together with Laerdal nonrebreathing valves, *i.e.*, RFB II valve components, including expiration diverters, without the flapper valve prior to 1982. *See* Michigan Instruments Catalog, Def.'s Ex. 129 at page 9. The catalog does not show the diverter.

h. Dr. James Elam and the Stat Blue Resuscitator. This was first marketed in the late 70's and was the first disposable manual resuscitator. It had a single entry squeeze bag. The valve assembly uses two balls and a spring. When pressure is applied from the squeeze bag, the ball and spring are pressed upwards shutting off the exhalation port,

---

4. The Laerdal RFB did not carry a number since it was the first. However, the succeeding models did, *viz.*, RFB II and RFB III. The parties for convenience referred to the RFB as RFB I.

causing the gas to go through the patient port. When the patient exhales, the bottom ball seats in the inlet port and forces the air out the exhalation port. It was not a commercial success.

### Anticipation

■ The defendant argues that the '941 Patent was fully anticipated by the various Laerdal devices and hence, invalid under § 102. This section renders invalid a patent where there was a device in public use or on sale more than one year prior to the patent filing date that contains each and every limitation of the claims of the patent. Defendant argues that either the RFB II or the RFB III resuscitator with the Laerdal diverter attached contains each and every limitation of the Cook Patent. However, these devices were sold and used with the so-called flapper valve attached. Defendant claims that the evidence showed that oftentimes the RFB II and RFB III resuscitators were, in fact, used without the flapper valve in hospitals in the United States and that the Laerdal valve assemblies were used without the flapper valve as part of the Thumper resuscitation system. However, the literature always showed the Laerdal resuscitators with the flapper valve and the Laerdal product warnings stated that the valve assembly should always be reassembled after cleaning as distributed, which included the flapper valve. Consequently, the court finds that the limitation of the '941 Patent:

said unobstructed port and said annular exit passage forming a valveless exit flow path during exhalation and forming a valveless in take flow path during spontaneous inhalation when said second opening is occluded

is not found in the any of the Laerdal resuscitators.

### Obviousness

■ The court, however, finds that defendant has met its burden of proving by clear and convincing evidence that this limitation was obvious in light of Laerdal and the other prior art relied on by the PTO and defendant in this case. First, Laerdal teaches that the flapper ring is for those situations where resuscitation is attempted when the atmo-

sphere might be contaminated such as in a burning building or in the vicinity of a chemical spill. This teaching, however, implies the reverse: it would be obvious that a flapper valve is not needed when resuscitation occurs in an uncontaminated atmosphere. The reason given for the unobstructed exit port in the Cook Patent is to allow the patient to breathe through the exit port where the gas entry port is occluded causing decreased pressure such as might occur if someone stepped on the gas line. If the air was contaminated, this would create the situation Laerdal was guarding against with the flapper valve. In fact, the user manual for plaintiff's First Response resuscitator (Def.Ex. 241) specifically warns that use of the product should be avoided in a contaminated atmosphere. Obvious ways of achieving the same result as the Cook Patent seeks in the event of an obstruction would be to remove the mask from the patient or remove the flapper valve.

Moreover, there were a host of resuscitator devices in the prior art, as disclosed by the Examiner, where the exit ports were unobstructed. Examples of such devices are the Cox reference relied on by the PTO as well as the original RFB manufactured by Laerdal. In addition to the foregoing, it is very relevant that the plaintiff has not been able, either before the PTO or this court, to define clearly the distinctiveness of the '941 Patent from the prior art. At the very beginning, in the original application for the patent filed on May 4, 1983, the plaintiff admitted that "[m]anual resuscitators are well recognized in the prior art" and are characterized by three basic components: "a mask, a specific directional control valve arrangement, and a squeezable bag." The novel features, however, were never articulated. The applicant instead said:

The novel features which are believed to be characteristic of this invention, both as to it organization and method of operation, together with further objectives and advantages thereof will be better understood from the following description considered in connection with the accompanying drawings in which a presently preferred embodiment of the invention is illustrated by way

of example. It is to be expressly understood, however, that the drawings are for the purpose of illustration and description only, and are note intended as definition of the limits of the invention.

For the succeeding five years, the Examiner consistently rejected the efforts to achieve patent allowance for, among other reasons,

being indefinite for failing to particularly point out and distinctly claim the subject matter which the applicant regards as the invention.

Moreover, the Examiner did not articulate any reason for changing his mind when he finally allowed the application for patent. The record before the Examiner, therefore, does not contain any distinct or definite claim as to the subject matter of the invention. This court, prior to the opening statements, pointedly asked plaintiff's counsel to state specifically what constituted the invention. The only response was that the invention was a novel combination of domed housing with an unobstructed exit port in cooperation with the duck-billed diaphragm. On analysis, none of the features of the '941 Patent is novel, and if the combination itself is claimed as novel, nevertheless the combination was obvious to one ordinarily skilled in the art. The one distinguishing feature of the Laerdal over the '941, the obstructed exit port, could in fact be described as an improvement over prior art resuscitators virtually all of which had unobstructed exit ports.

An inventor must disclose his invention to the public in sufficient detail to put others on notice as to the claimed subject matter and enable persons of ordinary skill in the art to make the claimed device. An inventor may only claim what is novel and non-obvious over the prior art and where he overreaches and attempts to cover subject matter which is properly in the public domain, the cost is an ultimate finding of invalidity. 35 U.S.C. § 103. In considering the scope of the claims, unclaimed features or advantages cannot be relied upon to limit the scope of overly broad claims in an attempt to impart patentability to claims which embrace otherwise old or unpatentable subject matter. *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, (Fed.Cir.1988).

A specific embodiment that may be different from the prior art is legally insufficient to prove patentability. The proper comparison is between the prior art and the claims.

The true difference between the plaintiff's First Response product, Pl.'s Ex. 17, and the Laerdal devices is that the former is a single use device while the Laerdal is reusable. Thus plaintiff's device can be manufactured much more cheaply than the Laerdal because the valve assembly is manufactured in a single piece rather than the multiple pieces required to be reusable. However, this one distinguishing feature is not a part of the patent claims and it is not novel. Dr. Barnes, plaintiff's expert witness, testified that the claims of the '941 Patent do not exclude devices that are made up of pieces that are screwed together. The Stat Blue Elam device, the first disposable resuscitator with a single piece valve assembly, was on sale long before the '941 Patent application.

The fact of the matter is that Laerdal described for the first time a resuscitator device that used a squeeze bag and a valve assembly using a duck-billed diaphragm which operated to open and close valves by moving up and down as a result of air or gas pressure. All other differences are cosmetic or obvious.

■ While there is no question that the plaintiff's product, the First Response resuscitator, Pl.'s Ex. 17, has met commercial success, the reason for the success is that it appeared on the market at a time when there was a massive shift in the medical products field from reusable to disposable products. If the plaintiff's product was reusable, as it could be under the claims, it could not be manufactured in one piece and would lose its desirability and cost advantage. It is clear, therefore, and the court so finds, that there is no nexus between the commercial success and the patented claims.

Accordingly, the court enters judgment in favor of the defendant and against the plaintiff.

**IT IS SO ORDERED.**