SMITHS INDUSTRIES MEDICAL SYS-
TEMS, INC., as successor of Intertech
Resources Inc., Plaintiff–Appellant,

v.

VITAL SIGNS, INC., Defendant–
Appellee.

No. 98–1106.

United States Court of Appeals,
Federal Circuit.

July 14, 1999.

Richard A. Schnurr, Marshall, O'Toole, Gerstein, Murray & Borun, of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief were Allen H. Gerstein, Owen J. Murray, and Danielle M. Johnston.

Richard L. DeLucia, Kenyon & Kenyon, of New York, New York, argued for defendant-appellee. Of counsel on the brief were Richard L. Mayer, Michael D. Loughnane, Elizabeth A. Gardner and John R. Hutchins. Of counsel were Charles Lee Thomason and R. Gale Rhodes, Jr., Thomason & Moser, of Red Bank, New Jersey.

Before LOURIE, CLEVENGER, and GAJARSA, Circuit Judges.

Opinion for the court filed by Circuit Judge CLEVENGER. Dissenting opinion filed by Circuit Judge LOURIE.

## ORDER

A petition for rehearing having been filed by appellant and a response thereto having been invited by the court and filed by the appellee,

Upon consideration thereof, it is

ORDERED that the petition for rehearing be granted for the limited purpose of clarifying this court's opinion.

IT IS FURTHER ORDERED that the previous opinion of the court in this appeal is withdrawn. The new opinion accompanies this order.

CLEVENGER, Circuit Judge.

Smiths Industries Medical Systems, Inc. ("Smiths") appeals from the judgment of the United States District Court for the Northern District of Illinois that all the claims of Smiths's patent for a manual resuscitator are invalid and that certain claims are not infringed by two accused products manufactured by appellee Vital Signs, Inc. ("Vital Signs"). See Smith Indus. Med. Sys., Inc. v. Vital Signs, Inc., 4 F.Supp.2d 746, 748–52 (N.D.Ill.1997). For the reasons set forth below, we conclude that the district court misinterpreted the claims of Smiths's patent. We therefore reverse the district court's judgment of invalidity under 35 U.S.C. § 103 and vacate its judgment of noninfringement. The case is remanded to the district court for further proceedings.

I

This appeal involves United States Patent No. 4,774,941, issued on October 4,

1988, to Wallace F. Cook (the "'941 patent" or the "Cook patent"). The '941 patent is assigned to Intertech Resources, Inc., which has been succeeded by plaintiff-appellant Smiths, and is directed to a manual resuscitator device. Both Smiths and Vital Signs manufacture and sell disposable manual resuscitator devices, which are used by medical personnel in emergency or trauma situations to supply air or oxygen to patients who have difficulty breathing on their own or who have stopped breathing.

Manual resuscitators are typically composed of three main elements: a face-mask that seals around the patient's nose and mouth, a directional valve assembly that directs gas to and from the patient, and a squeezable bag ("squeezebag") that supplies pressure for forcing gas to the patient. Some resuscitators employ a squeezebag with a single opening, which are known in the art as "single-entry bags." In a single-entry bag resuscitator, gas to be delivered to the patient first enters the squeezebag from a supply source and collects in the squeezebag; when the squeezebag is compressed, the collected gas exits the squeezebag through the same opening and is directed to the patient by the valve assembly. In contrast, "double-entry bags" have two openings at opposite ends; gas enters through one opening and is stored in the squeezebag, and is then delivered to the patient through the other opening. A further variation of the manual resuscitator, known in the art as a "mouth-to-mask" resuscitator, omits the squeezebag altogether. The mouth-to-mask resuscitator has a hollow tube in place of a squeezebag; a rescue worker supplies the pressure needed to force air into a patient's lungs by blowing through the hollow tube.

The key feature in manual resuscitators is the directional valve assembly. The valve assembly allows a resuscitator to operate in three different modes. First, during *forced inhalation,* a worker compresses the squeezebag, and the valve assembly allows gas to be forced into the patient's lungs. Second, during *exhalation,* the patient breathes out and the valve assembly directs the exhaled gases away from the patient and to the exterior of the resuscitation system. Third, during *spontaneous breathing,* the valve assembly allows a patient who is breathing on her own to draw air and/or oxygen though the squeezebag and to exhale into the outside environment. Thus, during inhalation, the valve assembly simultaneously opens a passageway from the squeezebag to the patient and closes off the air passage between the patient and the external environment; conversely, during exhalation, the valve assembly simultaneously closes off the passageway from the patient to the squeezebag and opens the air path from the patient to the external environment, so that exhaled gases are discharged to the exterior of the resuscitation system.

Figures 2 and 3 of the Cook patent, reproduced here, depict the operation of the '941 invention's valve assembly and the flow of air through the resuscitator during two of the three operating modes described above. Figure 2 shows the state of the valve assembly during forced inhalation. In this mode, a "duck-billed" diaphragm (30) seals against the end (36a) of a tube (36) to close off the exit port (38). The arrows show that the gas inside the squeezebag (12) passes through the duck-billed valve (30a) to the patient. Figure 3, in contrast, shows the operation of the valve during patient exhalation. The duck-billed diaphragm (30) disengages from the end of the tube (36), the duck-billed valve (30a) closes, and exhaled gases pass from the patient through the exit port (38) to the external environment.

Fig. 2

Fig. 3

Vital Signs, the defendant, sells three lines of products that are accused of infringing the '941 patent: a double-entry squeezebag resuscitator (the "Vital Blue"), a single-entry squeezebag resuscitator (the "Code Blue"), and a mouth-to-mask resuscitator (the "MM 7100"). Smiths brought suit in district court alleging that all three products infringe the '941 patent.

Claim 4 is one of two independent claims in the '941 patent and reads in relevant part:

    4. A resuscitator comprising:

(a) means for supplying gas having a hollow interior and first and second openings at opposite ends thereof;

(b) a directional control valve assembly fastened to said gas supplying means at said first opening;

. . .

(d) said assembly further comprising a tubular patient port joined to said first end of said valve housing and adapted to be coupled in gas flow communication to a patient . . .;

(e) ... an annular exit passage being formed between said valve housing and said extension and an interior flow passage being formed within said extension, said interior flow passage being in flow communication with said first opening;

(f) an unobstructed exit port formed in said valve housing in flow communication with said annular exit passage;

...

(h) said unobstructed port and said annular exit passage forming a valveless exit flow path during exhalation and forming a valveless intake flow path during spontaneous inhalation when said second opening is occluded.

In the course of proceedings before the district court, Vital Signs moved for partial summary judgment of noninfringement with respect to its Code Blue and MM 7100 resuscitators, arguing that claim limitation 4(a) did not read on these devices. The court interpreted the "means for supplying gas having ... first and second openings at opposite ends thereof," as recited in claim limitation 4(a), to refer to a means for supplying gas *under pressure*. *See Intertech Resources Inc. v. Vital Signs, Inc.*, 1997 WL 359966, at *3 (N.D.Ill.1997). Based on this interpretation, the court found that claim limitation 4(a) was literally met by neither the Code Blue nor the MM 7100, *see id.*, but it reserved for trial the question of whether these devices infringed under the doctrine of equivalents. After a full bench trial, the

court held that the accused Code Blue device does not infringe the '941 patent under the doctrine of equivalents.[1] *See Smith Indus.*, 4 F.Supp.2d at 749. Applying the function-way-result test, the court found that the location of the gas source and the squeezebag "makes a material difference in the operation of the device," citing as evidence: the amount of time it would take to fill each bag with oxygen, the difference in oxygen concentration provided to the patient, the difference in cost of the bags, the potential difference in the size of the gas entry openings between single- and double-entry squeezebags, and the difference in complexity between valve assemblies for single- and double-entry squeezebag resuscitators. *See id.*

With respect to the accused Vital Blue resuscitator, the court stated that "[t]here is not much dispute that the Vital Blue lines infringe the Cook patent if the Cook Patent is valid,"[2] but held that claims 1–6 are invalid as obvious under 35 U.S.C. § 103. *Smith Indus.*, 4 F.Supp.2d at 749–50, 752. In its validity analysis, the district court relied heavily on a previously issued patent, U.S. Patent No. 3,556,122 to Laerdal (the "Laerdal '122 patent"), as well as on three resuscitators manufactured by Laerdal and known as the Resusci Folding Bags ("RFB") I, II, and III, respectively. The court first found that RFB II and RFB III contained all of the limitations in the '941 invention except for the identical claim limitations recited in claims 1, paragraph (i) and claim 4, paragraph (h). Because RFB II and RFB III included a one-way valve—referred to by the parties as a "flapper valve"—which

1. In its opinion, the district court did not analyze infringement by the MM 7100 under the doctrine of equivalents. However, because the court interpreted claim limitation 4(a) to require a means for supplying gas *under pressure*, it may have determined that the MM 7100 could not infringe under the doctrine of equivalents because it has no squeezebag. *See Smith Indus.*, 4 F.Supp.2d at 749 (finding that the "way" the '941 inven-

tion operates is through "the delivery of air or oxygen forcefully to the patients [sic] mouth *through the use of a squeeze bag*" (emphasis added)).

2. We cannot be certain that the quoted language constitutes a judgment of infringement by the district court. We note that Vital Signs has not raised a cross-appeal on this issue.

ensured that outside air could not leak back into the resuscitator through the exit port, the court held that such devices did not have "an unobstructed exit port" and did not anticipate the claims of the '941 patent. Nevertheless, the district court found the addition of the unobstructed exit port to be obvious under section 103, noting that one could achieve the same result as the '941 patent simply by removing the flapper valve from the two RFB devices. *See id.* at 752.

Smiths appeals both the district court's ruling that the accused Code Blue and MM 7100 resuscitators are not within the language of claim limitation 4(a) of the '941 patent, and that claims 1–6 are invalid under 35 U.S.C. § 103.

## II

We first consider Smiths's argument that the district court erred in holding all the claims of the '941 patent invalid. Under 35 U.S.C. § 103, a claimed invention is unpatentable if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious" to one of ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103(a) (Supp. II 1996).

Smiths argues that the district court erred in three ways in holding the claims obvious. First, Smiths asserts that the district court misperceived or ignored differences between its claimed invention and the prior art. Second, Smiths alleges that the district court improperly combined the prior art, without any teaching or motivation to do so. Finally, Smiths argues that the district court did not give proper credit to the widespread commercial success of Smiths's products as objective evidence of nonobviousness.

## A

■ It is well-established that the first step in any validity analysis is to construe the claims of the invention to determine the subject matter for which patent protection is sought. *See Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1362, 47 USPQ2d 1027, 1029 (Fed.Cir. 1998); *Elmer v. ICC Fabricating*, 67 F.3d 1571, 1574, 36 USPQ2d 1417, 1420 (Fed. Cir.1995); *Beachcombers, Int'l v. Wilde-Wood Creative Prods.*, 31 F.3d 1154, 1163, 31 USPQ2d 1653, 1660 (Fed.Cir.1994). Claim interpretation for the purpose of analyzing patentability, like claim construction for considering infringement, is a legal matter over which we exercise *de novo* review. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed.Cir.1998) (en banc); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981, 34 USPQ2d 1321, 1331 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996).

■ The claims, properly interpreted, define the scope of the invention and allow the trial court to determine whether the claimed invention would have been obvious in light of the prior art. Here, however, the trial court failed to give a complete interpretation of the claims of the '941 patent. We note that by resolving the meaning to be given to disputed claim terms, and by engaging the parties in such a process, trial courts are often able to narrow disputes and provide more efficient trials. Despite the lack of a full claim construction, the district court's opinion does provide some insight into its understanding of the invention. In particular, it seems clear that the trial court understood the claimed invention to be a resuscitator with an unobstructed exit port, and which allows a patient to breathe outside air through the exit port if the gas supply to the squeezebag is blocked. *See Smith Indus.*, 4 F.Supp.2d at 752. Indeed, the court found that claim limitations 1(i) and 4(h), which recite the unobstructed exit port and its ability to act as an alternate

intake air path, did not read on the prior art RFB devices and thus precluded a finding of anticipation under section 102. The court did not dwell long on this limitation, however, finding that it would have been obvious to remove the flapper valve from Laerdal to achieve the limitation recited in claim limitation 4(h). *See id.*

Smiths contends that the trial court committed error because it failed to understand the nature of the '941 invention and because it overlooked a specific claimed feature of its invention. Specifically, Smiths asserts that in the spontaneous breathing mode, the claimed invention must allow a patient to *both* breathe air and oxygen through the squeezebag when the gas supply is not obstructed, *and* to be able to breathe outside air in the event that the gas supply to the squeezebag becomes blocked. According to Smiths, this aspect of its invention is unique because the prior art, including the Laerdal '122 patent and the RFB devices on which the district court relied to find the '941 invention obvious, require a patient *either* to breathe gas through the squeezebag *or* to breathe outside air through the exit port, but do not automatically alternate between these two options based on the state of occlusion of the gas source. Thus, Smiths argues, when configured with a flapper valve in place, the RFB devices allow a patient to breathe through the squeezebag but not through the exit port; conversely, when configured without a flapper valve, the RFB devices may allow a patient to breathe some air through the exit port but do not allow the patient to breathe exclusively through the squeezebag even when there is no obstruction in the gas supply.

We agree with Smiths's interpretation of the claims. The '941 patent does indeed claim a resuscitator which allows a patient to spontaneously inhale gas through the squeezebag during normal, nonoccluded gas supply operation, and to breathe out-side air through an unobstructed exit port should the gas source to the squeezebag become occluded. For example, claim limitations 4(d) and 4(e) recite that normally the patient is in "gas flow communication" with the interior flow passage of a tubular extension which, in turn, is in flow communication with the squeezebag. It follows that during normal inhalation, whether forced or spontaneous, the patient breathes in the gas that has collected in the squeezebag. Claim limitation 4(h) recites a further limitation, namely an "unobstructed [exit] port and [an] annular exit passage forming a valveless exit flow path during exhalation and forming *a valveless intake flow path during spontaneous inhalation when said second opening is occluded.*" '941 patent, col. 6, lines 51–55 (emphasis added). Claim 4 thus clearly includes a *second* alternative intake air path, via an unobstructed port, which exists only when the patient is breathing spontaneously and the second opening of the squeezebag (through which gas is supplied to the squeezebag) becomes blocked. The '941 patent therefore claims a resuscitator that normally allows a patient to spontaneously breathe gas that is stored in the squeezebag, but which automatically directs the patient to breathe ambient air through an unobstructed exit port if the gas supply to the squeezebag becomes occluded.

### B

The second step in an obviousness inquiry is to determine whether the claimed invention would have been obvious as a legal matter, based on underlying factual inquiries including: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) secondary considerations of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966).

We apply *de novo* review to the trial court's ultimate legal determination of obviousness, whereas we review the underlying factual determinations for clear error. *See Miles Lab., Inc. v. Shandon Inc.*, 997 F.2d 870, 877, 27 USPQ2d 1123, 1128 (Fed. Cir.1993).

■ The district court's erroneous claim construction also led it to err in its analysis of the differences between the claimed invention and the prior art. The district court's claim construction was incorrect because, as already discussed, claims 1–6 of the '941 invention are limited to a device that must *both* allow a patient to breathe through the squeezebag normally *and* to breathe outside air should a blockage occur in the gas supply, and to automatically switch between these two modes depending on the state of occlusion of the gas source. The district court understood that the ability to breathe through the exit port is an explicit limitation of the invention, but proceeded to find that this limitation could easily be met by removing the flapper valve from the RFB devices. *See Smith Indus.*, 4 F.Supp.2d at 752. Even if the court's fact-finding on this point is correct, it is not sufficient to support a conclusion of obviousness. Smiths concedes that a patient using the RFB device without a flapper valve would be able to breathe outside air through an unobstructed exit port. However, Smiths argues— based on evidence in the record—that a patient using an RFB II or RFB III device configured without a flapper valve would always breathe outside air through the exit port, presumably because outside air "leaks" into the resuscitator system unless a flapper valve is used. Removing the flapper valve from the Laerdal '122 invention might indeed allow that device to achieve the same result as the '941 invention when the gas source is blocked, but it might also jeopardize the functioning of the Laerdal resuscitator during normal, non-occluded operation.

We conclude that the district court misapprehended the nature of the '941 invention's emergency breathing feature and how it complements "normal" operation during spontaneous patient breathing. We therefore cannot agree with its conclusion that the only distinguishing feature of the '941 patent is an unobstructed exit port, nor that removal of the flapper valve would have been obvious to one of ordinary skill in the art at the time of the invention. Accordingly, the district court's finding that claims 1–6 of the '941 patent are invalid cannot stand.

We note that both the owner in interest Smiths and the inventor Cook, during litigation before the district court and throughout the prosecution of the '941 patent, respectively, have consistently emphasized the emergency breathing feature as a critical feature that distinguished the claimed invention over the prior art. For example, the prosecution history is replete with references to the emergency breathing feature in response to the examiner's repeated rejections over the Laerdal '122 patent reference. Similarly, when counsel for Smiths was asked by the trial judge at the opening of the bench trial to specifically identify the novelty in the '941 invention, counsel not only described the combination of elements such as a domed housing, an unobstructed exit port, and a duck-bill diaphragm, but also stated that the '941 invention "handled particularly well with the situation of spontaneous breathing either when the bag is occluded or when it is not occluded." Trial Transcript at 44, *Smith Indus.*, 4 F.Supp.2d 746. Despite Smiths's clear position on this issue, however, Vital Signs failed to prove at trial by clear and convincing evidence that the prior art devices possess the emergency breathing limitation claimed in the '941 patent, or that the prior art renders this claim limitation obvious. Accordingly, we reverse the trial court's judgment that claims 1–6 of

the '941 patent are invalid under 35 U.S.C. § 103.

### C

Our decision to reverse the trial court's decision on invalidity is also necessitated by the court's improper combination of various references in its obviousness analysis. Smiths conceded at trial that each limitation in the claims is probably found in the prior art. *See Smith,* 4 F.Supp.2d at 750. However, there is no basis for concluding that an invention would have been obvious solely because it is a combination of elements that were known in the art at the time of the invention. *See Fromson · v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1556, 225 USPQ 26, 31 (Fed.Cir.1985). Instead, the relevant inquiry is whether there is a reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success. *See, e.g., In re Dow Chem. Co.,* 837 F.2d 469, 473, 5 USPQ2d 1529, 1531–32 (Fed.Cir.1988). Such a suggestion or motivation may come from the references themselves, from knowledge by those skilled in the art that certain references are of special interest in a field, or even from the nature of the problem to be solved. *See In re Rouffet,* 149 F.3d 1350, 1355–56, 47 USPQ2d 1453, 1456 (Fed.Cir. 1998); *Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1573, 37 USPQ2d 1626, 1630 (Fed.Cir.1996).

Here, the district court summarily concluded that it would have been obvious to combine the various claim limitations found in the '941 invention from the prior art. *See Smith,* 4 F.Supp.2d at 753. However, the court never identified the source of the various claim limitations in the prior art, much less a motivation, teaching or suggestion to combine them. Indeed, the district court appears to have rested its decision in large measure on its conclusion that Smiths was unable "before the PTO ... to define clearly the distinctiveness of the '941 Patent from the prior art." *Id.* at 752. That, of course, was an incorrect basis for decision because the claims were allowed and the patent issued. The issued patent carries a presumption of validity. *See* 35 U.S.C. § 282 (1994). This presumption is manifested by the requirement that one who seeks to invalidate a patent do so by clear and convincing evidence, *see, e.g., Medtronic Inc. v. Intermedics, Inc.,* 799 F.2d 734, 741, 230 USPQ 641, 645 (Fed.Cir.1986), in view of the patent examiner's conclusion that the invention was patentable. *See, e.g., Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1467, 15 USPQ2d 1525, 1527 (Fed.Cir.1990); *Intervet America v. Kee–Vet Lab.,* 887 F.2d 1050, 1054, 12 USPQ2d 1474, 1477 (Fed.Cir.1989); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359, 220 USPQ 763, 770 (Fed.Cir.1984).

Vital Signs has not offered sufficient independent evidence to support the district court's decision to combine elements from different references, arguing only that the suggestion to combine references may come from the knowledge and common sense of a person of ordinary skill in the art. *See, e.g., In re Bozek,* 57 C.C.P.A. 713, 416 F.2d 1385, 1390, 163 USPQ 545, 549 (CCPA 1969). That knowledge *may* have been within the province of the ordinary artisan does not in and of itself make it so, absent clear and convincing evidence of such knowledge. *See C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1352, 48 USPQ2d 1225, 1232 (Fed.Cir. 1998); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281, 297–98, 227 USPQ 657, 667 (Fed.Cir.1985). Vital Signs thus failed in this case to establish why one of ordinary skill would have found it obvious to combine the numerous claim limitations in a particular way to achieve

the '941 invention. Therefore, the district court's judgment of invalidity must be reversed on this ground as well.

### III

We turn next to Smiths's contention that the district court erred in finding that the accused Code Blue and MM 7100 devices do not come within the language of claim limitation 4(a) of the Cook patent. Smiths argues that the district court erred as a matter of law by limiting claim limitation 4(a) to a means for supplying gas *under pressure*, rather than simply a means for supplying gas, and that the Code Blue and MM 7100 literally meet the properly construed claim limitation 4(a). Alternatively, Smiths takes issue with the trial court's factual findings under the doctrine of equivalents and argues that Vital Signs's own statements demonstrate that the Code Blue is equivalent to the Vital Blue resuscitator, which admittedly infringes the '941 patent.

To determine whether an accused product infringes a patent, a court must first construe the asserted claims of the patent to determine their proper scope, and then the trier of fact must determine whether all of the claim limitations are present, either literally or by a substantial equivalent. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248, 48 USPQ2d 1117, 1120 (Fed.Cir.1998). For a claim drafted as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6, a court must first look to the patent specification to determine the "corresponding structure" that performs the claimed function; the claim is then construed to cover that corresponding structure as well as "equivalents thereof." 35 U.S.C. § 112, ¶ 6 (1994); *see Valmont Indus., Inc. v. Reinke Mfg. Co., Inc.*, 983 F.2d 1039, 1042–43, 25 USPQ2d 1451, 1454–55 (Fed.Cir.1993).

### A

In its literal infringement analysis, the district court first held that claim limitation 4(a) is a means-plus-function limitation under section 112, ¶ 6. *See* 35 U.S.C. § 112, ¶ 6 (1994). Neither party has objected to this holding, and we therefore proceed accordingly. The court erred in the next step of the claim construction process by interpreting the claim language "means for supplying gas" to require a means for supplying gas *under pressure*. It is improper to import the limitation "under pressure" from the written description into the claim because the claim language is clear on its face. *See Renishaw*, 158 F.3d at 1248–49, 48 USPQ2d at 1121 (holding that there must be a claim term in need of clarification in order to draw in statements from the written description). Instead, the function recited by the means-plus-function claim limitation is simply the function of "supplying gas," and it is this function alone that serves as the touchstone for identifying the disclosed, corresponding structure that is recited by the means-plus-function claim limitation.

Section 112, ¶ 6 next directs the court to identify structure described in the patent specification that corresponds to the claimed function. *See Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934, 4 USPQ2d 1737, 1738–39 (Fed.Cir. 1987) (en banc). In this step, the trial court correctly identified a squeezebag as the structure corresponding to the gas-supplying function because it is the structure disclosed in the specification that performs such a function. For example, the written description plainly states that "[t]he bag is the means for supplying air under pressure to the patient." '941 patent, col. 1, lines 39–40. More specifically, the specification does not describe a generic squeezebag but rather only a *double-entry* squeezebag, as demonstrated by the figures in the '941 patent, the detailed description of the invention, and the language in claim limitation 4(a) itself. Thus, the "corresponding structure" in means-plus-function claim limitation 4(a) is limit-

ed to the double-entry squeezebag as shown and described in the specification of the '941 patent.

■■■ Finally, section 112, ¶ 6 provides that the literal scope of a means-plus-function claim includes the identified corresponding structure—in this case, the double-entry squeezebag—as well as "equivalents thereof." 35 U.S.C. § 112, ¶ 6 (1994); *see Pennwalt Corp.*, 833 F.2d at 934, 4 USPQ2d at 1738–39. For an accused structure to be an equivalent under section 112, ¶ 6, however, it must both have an equivalent structure and also perform the identical function as that recited in the claim language. *See Pennwalt Corp.*, 833 F.2d at 934, 4 USPQ2d at 1738–39. At the summary judgment stage, the trial court determined that the accused Code Blue and MM 7100 devices do not literally meet claim limitation 4(a) of the '941 patent because they do not have equivalent structure that performs the identical function. In particular, the court held that there is no structure in the accused devices that both supplies gas under pressure and meets the further structural limitation recited by claim 4, paragraph (a), namely that the structure also have "a hollow interior and first and second openings at opposite ends thereof." As set forth above, however, the district court's claim construction was flawed: the claimed function in the means-plus-function claim is "supplying gas," not supplying gas under pressure. Thus, the district court's section 112, ¶ 6 equivalents analysis was flawed because it used the incorrect function in its "identical function, equivalent structure" analysis. Accordingly, we vacate the court's finding of no literal infringement by the accused Code Blue and MM 7100 resuscitators.

■■■ The determination of the contours of the corresponding structure in a means-plus-function claim, as contrasted with the question of whether an accused structure is equivalent to such a corresponding structure, is a matter of law for courts to decide because it is a question of claim construction. *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308, 46 USPQ2d 1752, 1755–56 (Fed.Cir.1998); *B. Braun Med., Inc. v. Abbott Lab.*, 124 F.3d 1419, 1424–25, 43 USPQ2d 1896, 1899–1900 (Fed.Cir.1997). In this case, the squeezebag described in the '941 specification does not operate solely by supplying gas under pressure. In *one* of the operating modes—forced inhalation—the squeezebag is compressed and does indeed supply pressure to force air into the patient's lungs. In other modes, however, the squeezebag does not provide any pressure. For example, the written description states that during spontaneous breathing, the squeezebag supplies gas by merely allowing air to "flow through the bag 12 to the patient." '941 patent, col. 4, lines 24–25. Furthermore, the squeezebag also acts as a reservoir to collect oxygen. *See* '941 patent, col. 4, lines 43–48. Thus, the '941 specification suggests at least three different characteristics that inform how the disclosed squeezebag is a "means for supplying gas": first, as a flexible bag that can be squeezed to provide pressure for forcing air to the patient; second, as a hollow structure through which gas passes on its way to the patient; and third, as a reservoir for collecting oxygen or other gas that will be delivered to the patient.

In this court, both parties have presented arguments regarding why there is, or is not, equivalent structure in the accused devices which performs the "supplying gas" function. The district court did not address the merits of these arguments because of its erroneous claim construction, and we express no opinion on them here. Instead, we charge the district court with determining in the first instance whether there is structure in the accused devices that is equivalent to the '941 patent's double-entry squeezebag as described above,

and that performs the identical function of supplying gas. Similarly, we will not greet and decide the parties' various arguments as to why the Code Blue and MM 7100 devices may or may not infringe under the doctrine of equivalents. That issue should, again, be decided in the first instance by the trial court, employing the correct claim interpretation and understanding of the structure described in the specification that corresponds to the means limitation.

## IV

Because the district court erred in its interpretation of claim language in the '941 patent, the judgment that claims 1–6 of the '941 patent are invalid under 35 U.S.C. § 103 is vacated, and the judgment that the accused Code Blue and MM 7100 resuscitators do not meet claim limitation 4(a) of the '941 patent is vacated. The case is remanded to the district court for further proceedings.

## COSTS

No costs.

*REVERSED–IN–PART, VACATED–IN–PART, AND REMANDED.*

LOURIE, Circuit Judge, dissenting in part.

While I join the majority's opinion on the question of invalidity, I disagree that the question of infringement must await a remand and would instead affirm the judgment of noninfringement. I do agree that the district court erred in construing the expression "means for supplying gas" to require supplying gas "under pressure." However, in view of the readily understandable nature of the subject matter involved, we can ascertain that this error was harmless.

Smiths' argument concerning infringement of its patent by the Code Blue and 7100MM devices is untenable. Smiths' theory as to how the "means for supplying gas having ... first and second openings at opposite ends" limitation is met in the accused products is made clear with the help of the following diagrams from Smiths' brief which highlight those portions of the accused devices that allegedly correspond to this limitation:

**Code Blue 7200** (CA396)

**Code Blue Valve Assembly** (CA397)

**7100 MM** (CA398)

**7100 MM Valve Assembly** (CA399)

Smiths contends that the "connectors" (in solid black) *in the accused devices* between the valve assemblies and the air inlet passages meet the disputed limitation. Smiths does not contend that any connector *disclosed in the '941 patent* is the structure that corresponds to the claimed function in the disputed limitation under § 112, ¶ 6. If it did so, it would logically argue that the connectors in the accused devices have the same or equivalent structure as the connectors disclosed in the patent. However, Smiths concedes that the relevant structure disclosed in the patent is the squeeze bag. The only elements in the accused devices that correspond to this limitation are the squeeze bag of the Code Blue device and the "breathing tube" of the 7100MM. These elements clearly do not literally meet the disputed limitation. The squeeze bag of the Code Blue does not have first and second openings "at opposite ends"; they are on the *same* side. Moreover, no rea-

sonable fact finder could conclude that the solid breathing tube of the 7100MM is structurally equivalent to a flexible squeeze bag. These elements also do not meet the disputed limitation under the doctrine of equivalents. Because the openings of the Code Blue are on the same ends, Smiths' infringement argument would completely eradicate the "opposite end" limitation from the claims; it is thus precluded as a matter of law. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 1053 n. 8, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1875 n. 8 (1997) ("[I]f a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further material issue for the jury to resolve.") (emphasis deleted). Because the breathing tube of the 7100MM is not a structural equivalent under § 112, ¶ 6, and because the tube is not an "after-arising" component in relation to

the date of the patent, infringement under the doctrine of equivalents is again precluded. *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1311, 46 USPQ2d 1752, 1758 (Fed.Cir.1998).

Apparently realizing that these elements in the accused devices do not meet the disputed limitation, Smiths attempts to urge a finding of infringement when there is none by pointing to the connectors (*see* diagrams, *supra* ) as the infringing structure. Not only is such a theory specious given the more obvious relevance of the squeeze bag and the breathing tube to the disputed limitation, but the theory again fails for an obvious lack of structural equivalence. A solid connector is not structurally equivalent to a squeeze bag and therefore does not come within the disputed § 112, ¶ 6 limitation either literally or under the doctrine of equivalents. See Chiuminatta, *supra.*

The majority bends over backwards to try to accommodate this far-fetched infringement theory by effectively broadening the disclosure corresponding to the disputed limitation under § 112, ¶ 6. *See* maj. op. at 1358 ("Thus, the '941 specification suggests at least three different characteristics that inform how the disclosed squeeze[ ]bag is a 'means for supplying gas': first, as a flexible bag that can be squeezed to provide pressure for forcing air to the patient; second, as a hollow structure through which gas passes on its way to the patient; and third, as a reservoir for collecting oxygen or other gas that will be delivered to the patient."). The majority believes that consideration on remand of one of these disclosed "characteristics" may warrant a finding that the connector is an infringement. I disagree. In the end, all three "characteristics" relate to but one structure: the squeeze bag

disclosed in the patent. Section 112, ¶ 6, directs consideration to whether an element of an accused device is the same or structurally equivalent to the disclosed *structure* which corresponds to the claimed function, not to the operative characteristics of the disclosed structure. Smiths should not be able to ignore the structural characteristics of the squeeze bag and focus on its function.

I therefore see no need for a remand. I would thus affirm the district court's grant of summary judgment that neither the Code Blue nor the 7100MM devices literally infringes the '941 patent and the court's judgment that neither device infringes under the doctrine of equivalents.*

---

* I understand the district court to have found noninfringement of the 7100MM under the doctrine of equivalents, even though it was not specifically discussed by the district court in its post-trial opinion.